IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

RICHARD STEWART,

        Petitioner,

  v.

JEANNE S. WOODFORD, Acting Secretary,
California Department of Corrections and
Rehabilitation,

        Respondent.
_____/

No. C 05-04144 WHA

**ORDER DENYING PETITION
FOR WRIT OF HABEAS CORPUS**

**INTRODUCTION**

    Petitioner Richard Stewart was convicted of the shooting deaths of his mother, stepfather, and their roommate. He is currently serving three consecutive life sentences. He now seeks federal habeas relief under 28 U.S.C. 2254. He contends that the trial court improperly refused to immunize a potentially exculpatory witness. He further contends that the trial judge erred by refusing to instruct the jury that the prosecutor had the sole authority to immunize witnesses. He also alleges that he suffered from ineffective assistance of counsel by counsel's failure to introduce certain exculpatory evidence and because his trial attorney had a conflict of interest. This order rejects petitioner's claims. His petition is **DENIED**.

**STATEMENT**

In April 1991, a Contra Costa County jury convicted petitioner Richard Bert Stewart for the July 1989 shooting deaths of his mother, Gloria Pillow, his stepfather, Weldon Ardell Pillow (Ardell), and their roommate, Murray Lucas.  A jury later sentenced petitioner to death.  On direct appeal, however, the Supreme Court of California reversed the death sentence because of the trial court's errors in the voir dire process.  *See People v. Stewart*, 33 Cal. 4th 425, 431 (Cal. 2004).  The events leading up to his conviction and the facts underlying his petition are as follows.

After being paroled from state prison in early 1989, petitioner moved in with his girlfriend, Donna Guthrie, who lived in Richmond, California.  By late June 1989, petitioner allegedly had a .22-caliber handgun he took from an individual named Frank Walker.  Soon thereafter, petitioner — accompanied by Guthrie — visited his cousin, Gary Beach.  Petitioner test-fired the handgun by discharging a few rounds into an exterior garage wall of Beach's residence (Exh. B-13 at 1081–82, 1090–92; B-15 at 1667–75; Exh. C-13 at 27–38, 97–98, 101).

On the evening of July 3, 1989, petitioner visited the home of Shane Powell and Mary Perron, who were next-door neighbors of Gloria and Ardell.  Powell later testified that petitioner was upset and had complained about Gloria and Ardell's treatment of him.  Petitioner told them that his incarceration in prison — which he blamed on Gloria and Ardell — had dramatically changed him and added that "he [was] not responsible for his actions, whatever they may be" (Exh. B-11 at 705, 707–708, 711–712; Exh. B-12 at 979–80).

After petitioner left their house, Powell and Perron went to bed.  During the night they heard numerous Fourth of July firecrackers going off in the surrounding area.  At around 2:00 or 3:00 a.m., Perron woke up to the sound of gunfire and a "blood-curdling scream" coming from Gloria and Ardell's house next door.  Powell heard Gloria scream, "No, Richard, no," followed by more shots.  After conferring, they decided against calling the police and went back to bed (Exh. B-11 at 717–18; Exh. B-12 at 983–84, 1006, 1015–17).

2

United States District Court

For the Northern District of California

1    The next morning, Powell and Perron noticed that the Pillow residence was unusually

2    quiet and went to check on their neighbors.  They smelled natural gas upon entering the house

3    and proceeded to close four open burners on the stove.  Shortly thereafter, they found Gloria's

4    dead body curled in the corner of the bedroom.  They left the house and called the police

5    immediately (Exh. B-11 at 721–24; Exh. B-12 at 988).

6    A short time later, the police arrived accompanied by the fire department.  After airing

7    out the gas from the house, the police found no signs of forced entry.  They discovered the dead

8    bodies of Gloria, Ardell, and Lucas in the house.  All three had been shot in the head at close

9    range.  Ardell had lacerations on his face — which a forensic pathologist would later testify

10   resulted from being struck in the face before being shot.  In another area of the house, officers

11   found that the family dog had been strangled to death by a vacuum-cleaner hose.  There was

12   also evidence of attempted arson — a homemade incendiary device made out of a kerosene

13   lamp was found in the living room and the house was filled with natural gas when investigators

14   arrived.  Subsequent ballistics tests presented at trial suggested that the .22-caliber handgun

15   used in the murders was in fact the same gun that petitioner had allegedly used to test-fire a

16   bullet into the garage door of his cousin's residence days earlier.  At trial, however, petitioner's

17   trial counsel was quick to point out on cross-examination that forensic identification of the

18   bullets could not be unequivocally confirmed (Exh. B-11 at 812–30; Exh. B-12 at 1021–27,

19   1029–30, 1065–69, 1072).

20   Gloria's funeral was held on July 9, 1989.  Though petitioner was not yet in police

21   custody, he did not attend.  While sorting through Gloria's belongings, petitioner's siblings later

22   found letters petitioner had sent to his mother while he was in jail.  The letters, which were used

23   as evidence by the prosecution, revealed that petitioner in fact blamed Gloria and Ardell for his

24   incarceration (Exh. B-11 at 680, 682; Exh. B-12 at 970; Exh. B-13 at 1239, 1270–81; Exh. B-14

25   at 1378).

26   Through further investigation of the crimes, Richmond Police Officer Socorro Moreno

27   met a neighbor named Terry Lynn Guillory.  Guillory talked with investigators about the events

28

3

United States District Court

For the Northern District of California

of that night and eventually described the following accounts as a witness against petitioner at trial. Guillory told Moreno that he had heard five consecutive gunshots around 12:00 a.m. on the night of murders. After hearing these shots, Guillory ran to his living room window, looked across the street, and saw petitioner peeking out the front door of the Pillow residence. He explained to Moreno that he thought petitioner had seen him also — they made eye contact and petitioner said "Oh shit" or something of that nature and then disappeared back into the Pillow house. After learning of the murders the following morning, Guillory called petitioner's girlfriend, Guthrie, and her mother at their house — which was also petitioner's residence — to warn them about petitioner's potential involvement. Guillory later agreed to a tape-recorded interview with police and identified petitioner in a photo lineup. At trial, Guillory provided further details of his accounts that night and the following few days. Guillory was provided with limited immunity for his testimony in regard to two drug-related incidents (Exh. A-1 at 309–16; Exh. B-12 at 864–68, 870–72, 880–82, 897–900, 911, 1035–45).

Petitioner's counsel, however, attacked Guillory's character for truthfulness and his testimony during the trial. Guillory admitted that petitioner had called him the morning of the July 4, after the murders, and that he (Guillory) had lied about this at the preliminary hearing. Also, during his cross-examination, Guillory conceded that he told Inspector Alan Sjostrand of the Contra Costa District Attorney's office he had heard "street talk" to the effect that both Maurice Solvang and Guthrie had been inside the Pillow home on the night of the murders. Guillory admitted that he had refused to tell Inspector Sjostrand where, or from whom, he had heard this information (Exh. B-12 at 880–95, 909).

Petitioner's counsel presented other evidence in an attempt to discredit Guillory's testimony regarding the night of the murder. Craig Rock, a special investigator for the public defender's office, testified that the window through which Guillory allegedly saw petitioner was approximately 100 feet away from the door of the Pillow house and "could be partially obscured by a telephone pole" and that light from a nearby street lamp would be partially blocked by trees, thereby creating a shadow on the Pillow house. On cross-examination,

United States District Court

For the Northern District of California

1    however, Rock conceded that a light fixture on the Pillow's front porch may have illuminated

2    the area enough for Guillory to see the individual in the doorway (Exh. B-13 at 1302–20).

3       Guillory was in jail at the time of his testimony, having been arrested one week before

4    by Inspector Sjostrand for driving under the influence.  Cross-examination brought to light the

5    fact that Guillory, at the time of his arrest, had threatened to deny having seen and heard

6    petitioner at the Pillow house the morning of the murders (Exh. B-12 at 871, 873–76, 878–91).

7       According to the prosecution's evidence, petitioner, while in jail, made numerous

8    attempts to disrupt the administration of justice during his trial.  While in prison, petitioner

9    befriended Jacqueline Coghlan and arranged for Coghlan to visit the home of petitioner's father

10   to collect a $1000 check.  Though petitioner told his father the money was going to his legal

11   defense, the money was in fact part of petitioner's scheme to silence Guillory.  Petitioner

12   directed Coghlan to cash the check and deliver the money to Guthrie, who would then give the

13   money to Maurice Solvang who would be asked to kill Guillory.  After a few attempts, Coghlan

14   carried out petitioner's wishes — though, only in part — by delivering part of the money to

15   Solvang in a cigarette container.  The prosecutor and Inspector Sjostrand, when visiting Guthrie

16   (the girlfriend) the day before the preliminary hearing, found Solvang at Guthrie's house and

17   learned of petitioner's plans to call Solvang.  When petitioner called from jail, they recorded the

18   conversation.  It was only later revealed that this phone call was in regard to the payment

19   petitioner had made to Solvang to prevent Guillory from testifying against him.  Coghlan

20   admitted that the money she had delivered was intended to pay Solvang to silence Guillory.

21   Coghlan was granted limited immunity to testify at petitioner's trial about the exchange of

22   money (Exh. B-13 at 1143–70, 1184–90).

23      Additionally, in December of 1990, just prior to the preliminary hearing, petitioner

24   telephoned his cousin, Gary Beach, and asked Beach to testify that the handgun defendant had

25   test-fired at his house was in fact a .25-caliber gun, not a .22-caliber gun.  Beach did not testify

26   in accordance with petitioner's request (Exh. B-13 at 1100–06).

27

28

1    Petitioner presented some evidence to show a good relationship with his mother in an

2    attempt to rebut the prosecution's theory on motive.  For example, Contra Costa Public

3    Defender Anthony Thompson testified that he had previously represented Gloria and that he had

4    observed a good relationship between petitioner and his mother.  The prosecution, however,

5    cross-examined Thompson with negative letters petitioner sent to his mother, which shed some

6    doubt on petitioner's assertion that they had an amicable relationship (Exh. B-11 at 680, 682,

7    970; Exh. B-13 at 1270–81, 1378).

8    At the conclusion of the trial's guilt phase, petitioner was convicted of all of the charged

9    offenses — three counts of first-degree murder, possession of a concealable firearm by a felon,

10   and attempted arson.  The jury found true all of the allegations and special circumstances

11   underlying the charge.  Prior to commencement of the penalty phase, petitioner moved to

12   dismiss his trial counsel, Public Defender Charles James, and represent himself.  Eventually the

13   trial court granted petitioner's motion.  Petitioner appointed James to serve as his advisory

14   counsel.

15   As aggravating evidence in support of the death penalty, the prosecution presented a

16   number of petitioner's past violent crimes.  Petitioner merely gave a short opening statement

17   and rested without presenting any evidence.  As indicated above, the jury returned a penalty of

18   death.  A direct appeal to the Supreme Court of California was automatically initiated upon that

19   determination.  *See Stewart*, 33 Cal. 4th at 431.[1]

20   On July 15, 2004, while affirming the guilt-phase verdict rendered against petitioner, the

21   Supreme Court of California reversed petitioner's death sentence and remanded the matter for a

22   new penalty-phase trial.  *Id.* at 431–32.  The Contra Costa County District Attorney

23   subsequently declined to retry the penalty phase and on March 11, 2005, the trial court

24

25

26

27   [1] While petitioner's direct appeal was still pending, petitioner also filed a state habeas petition with the
Supreme Court of California on December 3, 2001.  The Supreme Court summarily denied the habeas petition

28   on September 15, 2004 (Exhs. E-1, E-27).

6

United States District Court

For the Northern District of California

1    sentenced petitioner to three consecutive terms of life imprisonment without the possibility of

2    parole.

3           On October 13, 2005, petitioner applied for federal habeas-corpus relief in this Court.

4    On December 21, 2005, this Court dismissed certain of petitioner's claims for failure to allege

5    exhaustion of state remedies, but allowed petitioner to amend his petition to demonstrate he had

6    in fact exhausted state remedies prior to his federal court petition.  Petitioner subsequently

7    amended his petition in an effort to meet these requirements.

**ANALYSIS**

8

9    **1.      FAILURE OF TRIAL COURT TO GRANT SOLVANG IMMUNITY.**

10          **A.      Factual and Procedural Background of Claim.**

11          On December 5, 1989 — the day before the preliminary hearing in petitioner's case —

12   the prosecutor and Inspector Alan Sjostrand of the Contra Costa District Attorney's office found

13   Solvang at Guthrie's residence and interviewed him briefly.  Later that day, Solvang agreed to

14   accompany them to the Richmond office of the district attorney and submit to a tape-recorded

15   interview (Exh. C-13; Exh. B-13 at 1184–90, 1285–90).

16          During those interviews, Solvang described his contact with petitioner before and after

17   the murders.  Among other things, Solvang said that petitioner told him that he (petitioner)

18   wanted to kill his mother and stepfather just a few days before the murders.  In response,

19   Solvang had actually advised petitioner in some detail how to go about committing the crime

20   without being "stupid" and getting caught.  Solvang told interviewers that petitioner had

21   explained to him exactly how he gotten the gun that was later used to commit the crimes.  Upon

22   Solvang's own recommendation, the two test-fired the gun.  They even went together to buy

23   bullets two days before the July 4 murders.  At the same time, however, Solvang stated that he

24   did not believe petitioner would actually carry out the crimes (Exh. A-1 at 11–13, 1289, 1303;

25   Exh. A-2 at 685; Exh. C-13 at 4, 11–12, 22, 24–38, 58, 97–98, 101).

26          According to Solvang, on July 5, 1989, a day after the murders, he went with Guthrie

27   and petitioner to a park for approximately four hours, during which time petitioner recounted

28

7

the details of the murders.  Petitioner allegedly told them how he killed each victim and how he had strangled the family dog with a vacuum-cleaner hose because the dog would not stop barking.  Solvang described petitioner's attitude as a mix between euphoria and depression, yet devoid of remorse when describing the events.  Despite Solvang's claim that he feared petitioner during their conversation in the park, Solvang advised petitioner to get rid of his clothing.  Solvang further recounted other pertinent details of the day's events to the members of the prosecution (Exh. B-13 at 1285–90; Exh. C-13 at 6, 9–10, 57–59, 63-64, 99, 102–105).

Petitioner's trial counsel first learned of Solvang's December 5 interview shortly after noon on December 6.  After numerous attempts, defense investigator Craig Rock finally secured an interview with Solvang for July 26, 1990, at the public defender's office with petitioner's trial counsel present.  Rock explained that during this interview, Solvang had told him that he was going to testify at trial in accordance with the prosecution's subpoena only if he received "user immunity from the D.A."  Solvang said that, upon receiving such immunity, he "would state that his previous statement to the D.A. regarding [petitioner's] involvement in the killings was a lie."  Rock stated:

> When I asked [Solvang] how he knew this, was he present at the killings, he said "possibly."  I then asked him if he did the shootings to which he again said "possibly."  I asked him if he knew about a bracelet that was left at the crime scene. [Solvang] asked me if I meant the one belonging to [Guthrie].  He then said we should check for her fingerprints on the wine bottle and on a pair of sunglasses.

(Exh. B-13 at 1329).  Solvang then explained that he had previously been engaged in a sexual relationship with Guthrie — but not when petitioner had been involved with her — however, they "had [since] gone their separate ways" (Exh. C-10; Exh. B-13 at 1286–87, 1328–1337).

More information regarding Solvang's possible involvement in the crime came out in a September 1990 interview between Solvang, Rock, and petitioner's defense counsel.  At this interview, Solvang still insisted on immunity before he would testify at trial.  Solvang explained that the prosecution had told him that "somebody else must be involved [in the murders]

8

because these victims didn't wait in line to be shot."  Solvang told Rock that the prosecution had also told him that if he cooperated with them, he (and Guthrie) would not be prosecuted "unless he did the actual killings" (Exh. B-13 at 1284–1291, 1308, 1328–37).  Solvang then asked defense counsel whether the public defender's office would represent him if he was implicated in the actual shootings.  They informed him that the court would likely appoint other counsel because there would be a conflict of interest.  Referring to petitioner, Solvang asked why a person would be "punished for something he didn't do," and stated that he did not want to see petitioner "get what they, the D.A., wanted him to get."  Solvang posed a hypothetical about himself and two others going into a house, seeing some "valuable items" and "things gett[ing] out of hand," leading them to "terminate certain people."  He then stated, "People with you [in that situation] have to decide whether they're going to be a witness against the person" (Exh. B-13 at 1328–37).

Rock later testified about his interviews with Solvang at a hearing to determine whether the court should grant Solvang immunity to testify at petitioner's trial.  Rock recounted other incriminating remarks Solvang made in regards to meeting the victims and Guthrie accusing Solvang of murdering them.  According to Rock, Solvang also had some information about Guillory.  He alleged that Guillory had demanded Guthrie share the money petitioner had told Coghlan to give to her in the cigarette package.  He even alleged that prosecution Inspector Sjostrand was present during one of these demands.  In fact, Inspector Sjostrand was present when Guillory asked Guthrie for money, but Guillory testified that the money he demanded from her had been previously owed to him (Exh. B-12 at 913–15, 921–23; Exh. B-13 at 1301, 1328–37).

On September 12, 1990, immediately following the second interview with Solvang, Rock served Solvang with a subpoena to testify for the defense at petitioner's trial.  Rock returned Solvang to a house where Guthrie was staying.  On their way to the house, they saw Inspector Sjostrand driving in the opposite direction.  Later, Rock was informed that the police received a domestic-disturbance call in the area and that Solvang had been arrested as a felon in

**United States District Court**
For the Northern District of California

possession of a gun and on an outstanding warrant.  Rock found out through another source that Guthrie (the girlfriend) had been "livid" at Solvang when she learned that Solvang was talking with the public defender — apparently she was afraid of being implicated in petitioner's crimes. Rock believed that this may have led Guthrie to phone in the domestic disturbance to the police. After being booked, Solvang was transferred to Contra Costa County Jail.  At the mid-trial immunity hearing outside the presence of the jury (discussed below), petitioner's counsel alleged that police had arrested Solvang in an effort to intimidate him not to testify in petitioner's trial (Exh. B-13 at 1287, 1289–90, 1303–11, 1314–22).

In March of 1991 — just prior to trial — petitioner's defense team claimed they were led to believe by the prosecution that they would call Solvang as a witness during petitioner's trial and that they had secured a removal order to ensure his transportation from jail to court. Rock testified, however, that he checked and found that the prosecution had not in fact sought such an order.  Rock also testified that during the trial, a day before the immunity hearing, he visited Solvang in jail and Solvang informed him that he would assert his Fifth Amendment privilege and decline to testify if called as a witness at petitioner's trial.  The parties stipulated that Solvang would in fact assert this privilege and refuse to testify "absent a grant of immunity from the District Attorney."  The prosecution had previously granted Guillory, Walker, and Coghlan limited immunity to testify at petitioner's trial, but they refused to grant any immunity to Solvang (Exh. A-1 at 309–316, 325–26; Exh. B-12 at 873–76, 878–91, 961; Exh. B-13 at 1133, 1168, 1282–1287, 1290, 1294, 1298–99).

On March 28, 1991 — during petitioner's trial — petitioner requested that the trial court grant immunity to Solvang.  Petitioner asserted that this grant of immunity would be proper in order to redress the prosecution's alleged interference with petitioner's right to present exculpatory evidence in his defense and to ensure petitioner's right to a fair trial.  The prosecution opposed the motion and pointed out that Solvang had conveyed to them a contradicting version of events during their September 1990 interview with him (Exh. A-2 at 691, 696; Exh. B-13 at 1284–1298).

10

On March 29, 1991, the trial court denied the motion.  The court's opinion questioned whether it had the inherent authority to grant such a request and whether the prosecution had in fact intimidated Solvang.  Solvang was not called as a witness in petitioner's trial (B-14 at 1352–55).

On direct appeal, the Supreme Court of California found that the trial court had not erred by denying petitioner's request of a grant of immunity for Solvang.  The state supreme court acknowledged that many courts "have recognized that the power to confer immunity is granted by statute to the executive, that is, to the prosecution, and have questioned whether a trial court possesses inherent authority to grant such immunity."  *Stewart*, 93 P.3d at 302.  Indeed, the Supreme Court of California itself had "characterized as 'doubtful' the 'proposition that the trial court has inherent authority to grant immunity.'"  *Ibid.* (quoting *People v. Lucas*, 907 P.2d 373, 401 (Cal. 1995)).  One decision by the state supreme court had, however, held that it was "possible to hypothesize cases" in which "a judicially conferred use immunity might possibly be necessary to vindicate a criminal defendant's rights to compulsory process."  *People v. Hunter*, 782 P.2d 608, 616 (Cal. 1989).

In light of *Hunter* court's statement, the state supreme court in petitioner's appeal followed the same analytical framework it had used in previous instances.  It expressly *assumed* that the trial court possessed authority to order transactional or use immunity and then considered whether petitioner's case fell into one of the "hypothetical cases" alluded to in *Hunter*.  *See*, *e.g.*, *In re Williams*, 870 P.2d 1072 (Cal. 1994); *People v. Cudjo*, 863 P.2d 635 (Cal. 1993).

Applying each of the two tests outlined in *Hunter*, the Supreme Court of California held that the trial court had not erred by denying petitioner's motion for immunity for Solvang.  In the first test, a trial court would have authority to confer immunity upon a witness if three requirements were met.  *First*, the "proffered testimony must be clearly exculpatory."  *Second*, "the testimony must be essential."  *Third*, " there must be no strong governmental interests which countervail against a grant of immunity."  *Hunter*, 782 P.2d at 616.

11

United States District Court

For the Northern District of California

The state supreme court held that petitioner had not established the third prong of this test because there would have been a strong governmental interest *against* conferring immunity on Solvang:

> The evidence presented at the hearing on the motion suggested that Solvang had given directly contradictory statements to the police and to the defense investigator regarding the events of the crime. His statements to the defense suggested that Solvang himself may have been the killer — and if that were true, there certainly would have been a strong governmental interest in not granting Solvang immunity (either "transactional" or "use") from prosecution. Moreover, even under the version of the facts related in Solvang's statement to the police, Solvang himself may have been guilty as an aider and abettor of the homicides, in that he admitted that, prior to the killings, he had given advice to defendant that would facilitate the commission of the murders. Under these circumstances, the prosecution reasonably would have been skeptical concerning which (if either) of Solvang's versions of the events was true.

> Contrary to defendant's assertions, even a grant of use immunity would have substantially burdened the People. Had such immunity been conferred, at any later prosecution of Solvang in connection with the homicides at issue in this case the district attorney would have been forced to prove that the evidence offered was not obtained or derived from Solvang's immunized testimony at defendant's trial. Moreover, conferral of such immunity would have facilitated perjury by Solvang, who had shown himself to be of questionable veracity, and at the same time it would have substantially limited the prosecution's ability to conduct a full and free-ranging cross-examination of Solvang at defendant's trial (so as to narrow the scope of testimony that Solvang later might claim had tainted any subsequent prosecution). Based upon these considerations, and given Solvang's apparent complicity and culpability, the prosecution clearly had a strong governmental countervailing interest in not granting him either use or transactional immunity.

*Stewart*, 93 P.3d at 302–03.

The Supreme Court of California also found that petitioner failed the second of *Hunter*'s tests. Under that formulation, a trial court would have the authority to grant immunity if "the prosecutor intentionally refused to grant immunity to a key defense witness for the purpose of suppressing essential, noncumulative exculpatory evidence, thereby distorting the judicial factfinding process." *Id.* at 303. Relevant to the instant case, the court stated that "defendant has not met his burden of establishing that the prosecution's treatment of Solvang constituted an

intentional distortion of the factfinding process with reference to . . . the prosecution's refusal to grant immunity to Solvang, while granting limited immunity to other witnesses." *Id.* at 303–04. The court held:

> [C]ontrary to defendant's speculation that the prosecution sought to pressure and punish Solvang after learning of his September 12, 1990, interview with the defense by refusing to grant him immunity while granting immunity to other witnesses, the record shows that beginning at the December 6, 1989, preliminary hearing, the prosecution consistently had declined to grant Solvang immunity. Although the prosecution granted very limited use immunity to witnesses Coghlan and Guillory, the People did not rely "heavily" upon immunized testimony in proving their case. We find no support for the hypothesis that the prosecution changed its position concerning the propriety of immunity for Solvang in response to his September 12, 1990, interview with the defense team.
>
> Accordingly, we conclude that defendant has failed to satisfy the second test referred to in *Hunter*, 782 P.2d at 617, which potentially authorizes a trial court to grant immunity to a defense witness when the prosecution has acted with the deliberate intention of distorting the factfinding process.

*Id.* at 304 (citations omitted).

### B.     Analysis.

Petitioner contends he is entitled to habeas relief because the trial court committed constitutional error when it failed to immunize a witness who might have exculpated petitioner. This order disagrees. Petitioner cannot establish that the state court's determination of this claim resulted in a decision that was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States. *See* 28 U.S.C. 2254(d)(1).

Petitioner rests on the general principle that a defendant has a right to present a complete defense. Petitioner contends that this right necessarily means that a defendant has a right to judicially conferred immunity for witnesses with relevant, exculpatory evidence. No such right, however, has been established by the Supreme Court.

Petitioner cites to several Supreme Court decisions in an attempt to establish a defendant's right to judicially immunized witness testimony. Notably, *none* of the decisions

13

involve the issue of immunity.  In *Washington v. Texas*, 388 U.S. 14 (1967), the Supreme Court

held that it violated the Sixth Amendment for the trial court to exclude evidence potentially

exculpatory to a defendant.  The excluded witness in *Washington* would have corroborated the

defendant's version of facts that he was present during the charged murder but did not actually

commit the crime.  The Supreme Court stated:

> The right to offer the testimony of witnesses, and to compel their
> attendance, if necessary, is in plain terms the right to present a
> defense, the right to present the defendant's version of the facts as
> well as the prosecution's to the jury so it may decide where the
> truth lies.  Just as an accused has the right to confront the
> prosecution's witnesses for the purpose of challenging their
> testimony, he has the right to present his own witnesses to
> establish a defense. This right is a fundamental element of due
> process of law.

*Id.* at 19.

In *Roviaro v. United States*, 353 U.S. 53, 60–61 (1957), the Supreme Court held that

"[w]here the disclosure of an informer's identity . . . is relevant and helpful to the defense of an

accused, or is essential to a fair determination of a cause, the privilege [to withhold the identity

of persons who furnish confidential information to law enforcement officers] must give way."

In determining whether an informer's identity may be disclosed, a court must balance "the

public interest in protecting the flow of information against the individual's right to prepare his

defense."  *Id.* at 62.

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that "the

suppression by the prosecution of evidence favorable to an accused upon request violates due

process where the evidence is material either to guilt or to punishment, irrespective of the good

faith or bad faith of the prosecution."  Such evidence must be "favorable to the accused, either

because it is exculpatory, or because it is impeaching; that evidence must have been suppressed

by the State, either willfully or inadvertently; and prejudice must have ensued."  *Strickler v.*

*Greene*, 527 U.S. 263, 281–82 (1999).

Likewise, in *Chambers v. Mississippi*, 410 U.S. 284 (1973), the Supreme Court held that

the defendant was denied a fair trial when the state's evidentiary rules prevented him from

14

United States District Court

For the Northern District of California

calling witnesses who would have testified that another witness made trustworthy, inculpatory statements on the night of the crime.  As in *Washington*, the Supreme Court held that exclusion of critical corroborative evidence was unconstitutional because it interfered with the defendant's right to defend himself against the state's accusation.  *See id.* at 298-302.

In *Crane v. Kentucky*, 476 U.S. 683, 690–91 (1973), the Supreme Court again reiterated the constitutional guarantee of a "a meaningful opportunity to present a complete defense."  In recognizing that "an essential component of procedural fairness is an opportunity to be heard," the Supreme Court held that "[t]hat opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence."  Finally, in *Rock v. Arkansas*, 483 U.S. 44 (1987), the Supreme Court held that a state could not "arbitrarily or disproportionately" prevent a defendant from testifying by implementing a *per se* rule excluding all hypnotically enhanced testimony.

Together, these decisions "stand for the proposition that states may not impede a defendant's right to put on a defense by imposing mechanistic (*Chambers*) or arbitrary (*Washington* and *Rock*) rules of evidence."  *LaGrand v. Stewart,* 133 F.3d 1253, 1266 (9th Cir. 1998).  Similarly, Justice O'Connor has noted that "[t]hese cases, taken together, illuminate a simple principle:  Due process demands that a criminal defendant be afforded a fair opportunity to defend against the State's accusations.  Meaningful adversarial testing of the State's case requires that the defendant not be prevented from raising an effective defense, which must include the right to present relevant, probative evidence."  *Montana v. Egelhoff*, 518 U.S. 37, 63 (1996) (O'Connor, J., dissenting).

The general proposition established by these decisions is not in doubt.  This order holds, however, that there is no law clearly established by the Supreme Court that recognizes a defendant's constitutional right to judicially conferred immunity for a witness with potentially exculpatory testimony.  Petitioner seeks to extend the defendant's right to present a complete defense to territory the Supreme Court has never addressed.  Petitioner contends that the trial

**United States District Court**
For the Northern District of California

1    court interfered with his right to present a full defense when it declined to grant immunity to a

2    witness with potentially exculpatory evidence.  But the Supreme Court holdings "do not stand

3    for the proposition that a defendant must be allowed to put on any evidence he chooses."

4    *LaGrand*, 133 F.3d at 1266.  Indeed, petitioner seems to concede that there is no Supreme Court

5    authority on point.  He points out that other courts have found clearly-established federal law

6    even where Supreme Court case law does not rest "on all fours."  *Lewis v. Johnson*, 359 F.3d

7    646, 655 (3d Cir. 2004) ("Further, we note that case law need not exist on all fours to allow for

8    a finding under *Teague* that the rule at issue was dictated by Supreme Court precedent.").

9            Here, however, the holdings do not come close to establishing the right petitioner claims

10   exists.  *Significantly, none of the decisions upon which petitioner relies discuss immunity.*

11   Indeed, in *Hunter v. California*, 498 U.S. 887, 887 (1990), the Supreme Court declined an

12   opportunity to decide whether a constitutional right to judicially immunized testimony exists.

13   Dissenting from the denial of certiorari, Justice Marshall stated:  "This petition for certiorari

14   presents the significant issue whether, and under what circumstances, a criminal defendant has a

15   constitutional right to judicially immunized testimony useful to establishing his defense.  I have

16   previously expressed my view that this Court should resolve the conflict of lower court

17   authority on this question."  Petitioner cites no intervening Supreme Court precedent that

18   resolved what Justice Marshall described as a "conflict of lower court authority" regarding a

19   constitutional right to judicially immunized testimony.  Additionally, petitioner cites no

20   decision holding that the Supreme Court has ever resolved this lower-court conflict.[2]

21           Petitioner points out that there is Ninth Circuit authority on the issue of immunized

22   witnesses.  *See*, *e.g.*, *United States v. Duran*, 189 F.3d 1071, 1087 (9th Cir. 1999); *United States

23   v. Westerdahl*, 945 F.2d 1083, 1086–87 (9th Cir. 1991); *United States v. Brutzman*, 731 F.2d

24   1449, 1452 (9th Cir. 1984); *United States v. Lord*, 711 F.2d 887, 890–92 (9th Cir. 1983).  These

25

26   _____

27       [2] *Hunter* was the denial of certiorari from the Supreme Court of California's decision in *People v.
     Hunter*, 782 P.2d 608 (Cal. 1989), wherein the state supreme court had stated that it was possible to
28   "hypothesize" situations in which a trial judge could grant use immunity.

United States District Court

For the Northern District of California

1    decisions are all based on federal statutory authority providing that a federal prosecutor may

2    grant use immunity in certain circumstances.  *See Lord*, 711 F.2d at 891–92 (citing 18 U.S.C.

3    6002, 6003).  None of these decisions held that a defense witness was entitled to immunity

4    based on any Supreme Court decision.  Petitioner's citation to Ninth Circuit authority is

5    unavailing.

6         Further evidencing the lack of support for his position, petitioner also does not explain

7    what the parameters of such a right would be or why the trial judge here erred by denying the

8    motion for Solvang's immunity.  Even if there were such a right, petitioner has not explained

9    why the last-reasoned state court pronouncement on this issue — the Supreme Court of

10   California's decision on direct appeal — was contrary to or an unreasonable application of

11   United States Supreme Court precedent.  Indeed, the state supreme court's decision explained in

12   great detail why the trial court did not err.  For all of these reasons, petitioner has not

13   established entitlement to a writ of habeas corpus because of the trial judge's failure to grant

14   immunity to Maurice Solvang.

15        **2.    REFUSAL TO INSTRUCT REGARDING POWER TO GRANT IMMUNITY.**

16        Despite Solvang's refusal to testify, his name frequently came up through properly

17   admitted evidence during the course of the trial.  Most "damaging" to petitioner was the

18   evidence relating to petitioner's alleged plot to pay Solvang to dissuade Guillory (the neighbor

19   across the street) from testifying at trial.  The record reflected that: (1) Solvang collected $800

20   from Coghlan that was apparently designed as a payment for Solvang to deter Guillory from

21   testifying; and (2) Solvang spoke with petitioner the night before the preliminary hearing —

22   which was tape recorded by Inspector Sjostrand — and petitioner asked him whether

23   "[a]nything ever work[ed] out," apparently referencing the effort to prevent Guillory from

24   testifying.  Additionally, Inspector Sjostrand testified that Solvang prompted police to search a

25   pond for the weapon and shoes petitioner used during the murder — though the police did not

26   actually find those items (B-13 at 1143–70, 1184–90).

27

28

17

United States District Court

For the Northern District of California

Petitioner claims that he is entitled to habeas relief because the trial court did not instruct the jury that the prosecutor had the sole authority to grant immunity. Petitioner's complicated argument is as follows. The evidence before the jury placed great emphasis on Maurice Solvang's role. According to petitioner, the prosecution emphasized during closing arguments that Solvang collected money from petitioner in exchange for a promise to kill Guillory. Petitioner contends that if the state had called Solvang as a witness, he may or may not have confirmed Coghlan's testimony that he took money from petitioner in exchange for a promise to kill Guillory. But the state did not grant immunity to Solvang, who never testified at trial. Thus, petitioner contends that because Solvang did not testify, the jury speculated that Solvang's testimony would have been harmful to petitioner because it would have confirmed Coghlan's testimony. Petitioner requested that the trial judge instruct the jury that it was in the prosecutor's sole discretion to grant immunity. That request was denied. In petitioner's view, the requested instruction would have allowed the jury to infer that the state did not call Solvang and offer him immunity because the testimony he would have provided would not have assisted the state and instead would have benefitted petitioner. According to petitioner, it was a due process violation by that court to refuse to give the instruction explaining who had the power to grant immunity.

Petitioner contends that a due process violation lies where state law makes a particular subject matter relevant but the trial judge declines to bring such an issue to the jury's attention. Under the right described by petitioner, he must first establish that the state law has made a particular issue "relevant." Petitioner relies on Article I, Section 28(d) of the California constitution, which states that except were provided by statute, "relevant evidence shall not be excluded in any criminal proceeding, including pretrial and post conviction motions and hearings." He also cites *People v. Ford*, 754 P.2d 168, 179–80 (Cal. 1988), which stated that "[t]he failure of a defendant to call an available witness whom he could be expected to call if that witness testimony would be favorable is itself relevant evidence." The Supreme Court of

18

United States District Court

For the Northern District of California

California ultimately held in *Ford* that a prosecutor may comment upon a defendant's failure to introduce logical evidence or call logical witnesses.

This order assumes without deciding that petitioner is correct that the California constitution and *Ford* imply that it was relevant for the jury in this case to know that the prosecutor had the sole power to grant Solvang immunity. Even so assuming, petitioner's claim lacks merit due to his failure to demonstrate that by declining to give the requested instruction, the trial court violated petitioner's due process rights. Petitioner has not demonstrated that there is any clearly established United States Supreme Court precedent declaring that a defendant has a right to an instruction where the jury might draw a particular inference based on the prosecution's failure to call a witness.

In support of this failure-to-instruct argument, petitioner relies on two United States Supreme Court decisions. *First*, petitioner relies on the general proposition recognized in *Crane v. Kentucky*, 476 U.S. 683, 690 (1986), that defendants are guaranteed "a meaningful opportunity to present a complete defense." In *Crane*, the Supreme Court held that the exclusion of evidence concerning the defendant's confession violated the defendant's rights under the Fourteenth and Sixth Amendments where the credibility of the confession was at issue. *Crane*, however, had nothing to do with giving an instruction like the one petitioner requested here. *Crane* does not support petitioner's contention that any infringed right was "clearly established."

*Second*, petitioner relies on *Simmons v. South Carolina*, 512 U.S. 154, 156 (1994). In *Simmons*, the Supreme Court held that "where a defendant's future dangerousness is at issue [in a capital murder case], and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that a defendant is parole ineligible." A plurality of justices recognized that an individual cannot be executed on the basis of information which he has no opportunity to deny or explain. Because the prosecution had suggested that the defendant would pose a future danger to society if he were not executed, the trial court's refusal to instruct the jury that life imprisonment of the defendant would carry no possibility of parole

United States District Court

For the Northern District of California

1   violated the defendant's due process rights.  The Supreme Court held that this "had the effect of

2   creating a false choice between sentencing [the defendant] to death and sentencing him to a

3   limited period of incarceration."  *Id.* at 161.  The trial judge had, in essence, concealed "the true

4   meaning of [the state's] noncapital sentencing alternative, namely, that life imprisonment meant

5   life without parole."  *Id.* at 162.

6        It is difficult to see how *Simmons* operates as clearly established Supreme Court

7   precedent for the alleged violation in this case.  *Simmons* considered the situation where a

8   defendant was "prevented from rebutting information that the sentencing authority considered."

9   *Id.* at 164–66.  Petitioner's claim, however, has nothing to do with the sentencing decision and

10  is based on the prosecutor's authority to grant immunity to witnesses.  The refusal to instruct

11  the jury that such authority was in the prosecutor's sole discretion, petitioner alleges, led the

12  jury to simply assume that Solvang's testimony would have been favorable to the government.

13  This order holds that to the extent *Simmons* applies outside of the sentencing context, it

14  overextends the rule announced therein to apply that holding here.  Because the Supreme Court

15  has not "broken sufficient legal ground to establish [this] asked-for constitutional principle," it

16  has not established "such a principle with clarity sufficient to satisfy the AEDPA bar."  *Ferrizz*

17  *v. Giurbino*, 432 F.3d 990, 993–94 (9th Cir. 2005).

18       Moreover, even if there were some clearly established Supreme Court precedent on

19  point, petitioner's claims are rejected because the Supreme Court of California's determination

20  of the issue on appeal was neither contrary to, nor an unreasonable application of, due process

21  standards.  The state supreme court's opinion gives a reasonable explanation why the trial

22  court's refusal to give the requested instruction was proper on the facts of the case.  The state

23  supreme court recognized that

24          the properly admitted evidence — (I) from witness Jacqueline
            Coghlan, concerning the cash delivery from defendant to Solvang;
25          (ii) concerning the telephone conversation that Inspector Sjostrand
            recorded on the eve of the preliminary hearing, in which defendant
26          asked Solvang, 'Anything ever work out?'; (iii) concerning
            defendant's letter to Donna in which he referred to 'the cookie' (a
27          reference to Guillory) and told Donna to '[r]emind me when I talk

28

                                        20

> to you to explain to you how one little mess can be cleaned'; and
> (iv) from Inspector Sjostrand, concerning Solvang's tip relating to
> the possible location of the murder weapon — considered as a
> whole, provided the jury with an ample basis upon which to infer
> that Solvang in fact had accepted money as part of a plot to silence
> Terry Guillory, and that Solvang learned of the disposal of the
> murder weapon from his contacts with defendant.

*Stewart*, 93 P.3d at 307. This order finds no fault with the Supreme Court of California's conclusion: "We agree with the trial court's determination that no special instruction concerning the prosecution's exclusive authority to confer immunity was required under these circumstances, and further conclude that, in any event, there is no reasonable probability that the result in this case would have been different had the requested instruction been given." *Ibid.*

The state supreme court reasonably determined that the trial court did not err by refusing to give the proposed instruction. In this case, the question of immunity did not go to any particular factor to be considered by the jury, as was the case in *Simmons*. The possible instruction here may only have supported a *possible* inference by the jury, one based on the *possibility* that they would speculate about Solvang's absence. Petitioner makes an unconvincing showing that the proposed instruction here was necessary to presenting a full defense. For all of the above-stated reasons, petitioner has failed to meet the AEDPA standard for habeas relief on this claim.

### 3.    INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILURE TO PRESENT EVIDENCE.

At trial, petitioner's counsel Charles James tried to present a case that would establish reasonable doubt as to the identity of the actual killer. For example, petitioner's counsel cross-examined Guillory as to some "street talk" about Solvang being the actual murderer. Counsel later stressed this information in his closing argument. He further argued that Solvang had to be involved somehow and, yet, he was not called as a witness suggesting that the prosecution had something to hide (Exh. B-14 at 1540–43).

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

Petitioner argues that his trial counsel had an opportunity to present more evidence to establish reasonable doubt as to the killer's identity and should have presented that evidence at trial. Petitioner argues that his counsel's failure to do so rendered his counsel's assistance constitutionally ineffective. For the reasons described below, petitioner's contention that trial counsel erred by failing to introduce evidence lacks merit.

Petitioner points to two specific items of evidence that he argues should have been presented at trial. *First*, petitioner points to an incident suggesting that Solvang had a "history of shooting at dogs" (Amd. Pet. 26). According to a witness in a 1979 state criminal court proceeding against Solvang in an animal-abuse matter, Solvang walked up to the witness while she was walking her dog and shot the dog. Petitioner argues that this information was relevant in his trial because of evidence that the family dog was murdered at the Pillow residence. There was no attempt by petitioner's counsel to present evidence of this incident at trial (Exh. E-20 No. 131; Exh. E-21 No. 147).

*Second*, petitioner argues that his trial counsel should have presented Solvang's admissions during his interview with Investigator Rock, particularly his suggestion that Solvang, not petitioner, had "possibly" killed the victims as discussed above. Those statements, petitioner argues, were very relevant and necessary to his reasonable doubt defense (Exh. B-13 at 1328–37).

The Sixth Amendment recognizes a criminal defendant's right to have "the assistance of counsel for his defense." The Supreme Court has determined that an individual defendant has a right to counsel in a criminal matter, whether that counsel is retained by the defendant or, with some exceptions, appointed by the court. *Gideon v. Wainwright*, 372 U.S. 335 (1963). This right to counsel is based on the premise that the defendant is due a fair trial. One element of a fair trial is the defendant's ability to have the right to *effective* assistance of such counsel because of counsel's crucial role in our adversarial system. *Strickland v. Washington*, 466 U.S. 668, 685 (1984).

United States District Court

For the Northern District of California

In order to establish an ineffective assistance of counsel claim, a habeas petitioner must make two showings. *First*, the burden is on a petitioner to demonstrate that counsel's performance was deficient. In other words, a petitioner must demonstrate that his or her "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Petitioner must show that counsel's representation fell below an objective standard of reasonableness. *Id.* at 688.

*Second*, a petitioner must show a causal link between the deficient performance and actual prejudice. This entails a showing that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Ibid.* When a petitioner is challenging his or her conviction, the appropriate question is "whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Id.* at 695; *see also Wiggins v. Smith*, 539 U.S. 510, 536-38 (2003) (considering whether there was a reasonable probability that the jury would have reached a different verdict had the attorney pursued the alternative strategy).

### A.    Solvang's Dog-Shooting Incident.

Petitioner claims that his counsel was ineffective by failing to admit evidence of a March 1979 incident where Solvang was implicated for shooting someone's dog. Considering that the Pillows' dog was killed at the murder scene, petitioner contends that this evidence could have raised some reasonable doubt as to whether Solvang was in fact the killer. This argument lacks merit.

Petitioner's counsel would have run into admissibility problems had he tried to admit this evidence. Petitioner's trial concerned the murder of three people. Remote evidence that another individual shot a dog would have had little relevance. The manner in which the acts were performed were different — in one, a dog was shot and in the other, a dog was strangled. The dog-shooting incident was over 19 years old at the time of petitioner's trial. Furthermore, petitioner provides no evidence that the witness from the 1979 incident would have been available to testify at petitioner's trial. Petitioner relies on a hearsay transcript from a

**United States District Court**
For the Northern District of California

1    preliminary examination that may not have been admissible at petitioner's trial.  *See* Cal. Evid.

2    Code 1200.

3         In view of all of these problems with the evidence, petitioner has not shown that

4    deficient attorney performance arose from the failure to offer such irrelevant evidence.

5    Moreover, it is difficult to see how such omission was prejudicial.  Petitioner has failed to

6    establish any claim of ineffective assistance of counsel for James' failure to admit evidence of

7    Solvang's prior act.

8                  **B.    Statements that Solvang Was Involved "Possibly."**

9         Petitioner next alleges that trial counsel rendered constitutionally inadequate assistance

10   by failing to present at trial Solvang's pretrial statements to defense Investigator Rock.  These

11   included statements that potentially implicated Solvang as the shooter.  Specifically, Solvang

12   had:  (1) told Rock that petitioner was an innocent witness to the killings; (2) mentioned that he,

13   Solvang, had "possibly" done the shootings; (3) asked Rock, "Why should a person be punished

14   for something he didn't do," and said, "I don't want to see Richard Stewart get what they want

15   him to get"; (4) stated that he would testify for petitioner only if he received immunity, but

16   would otherwise invoke his Fifth Amendment right; (5) asked if the public defender's office

17   could defend Solvang if the evidence shifted to Solvang and away from petitioner (Exh. C-10 at

18   1331; Exh. E-21 No. 145).

19        Petitioner is correct that these statements, if true, might have implied that Solvang, not

20   petitioner, was the actual killer.  There were, however, several significant problems with the

21   evidence.  *First*, the introduction of some of Solvang's pretrial statements would have likely

22   resulted in opening the door to all of Solvang's other pretrial statements.  During his interviews

23   with prosecution investigator Sjostrand, Solvang had explained that petitioner had described

24   how he wanted to kill his mother and stepfather.  He had also explained how petitioner had

25   gotten the weapon used in the murders.  The two men had test-fired the gun together before the

26   murders.  Solvang also told investigators how, the day after the murders, petitioner had

27   recounted the details of the murders.  Solvang explained that petitioner told him how he had

28

                                                24

United States District Court

For the Northern District of California

strangled the dog because of the dog's barking. These statements were highly inculpatory of petitioner and it was reasonable trial strategy to prevent the jury from hearing any of Solvang's statements. If Solvang's alleged exculpatory statements to the public defender were to be admitted, then Solvang's inculpatory statements to the prosecution and its investigators would also be admitted. By admitting the some beneficial evidence — namely, evidence of Solvang "possibly" being the murderer — petitioner's counsel would have admitted a whole host of damaging evidence.

*Second*, the statements themselves were not as valuable as petitioner argues. Admitting Solvang's statements might have actually been detrimental to petitioner's case. Defense counsel's strategy was to establish that there was *no* evidence of petitioner's involvement in the murders. In closing argument, counsel discounted certain witnesses' statements to the contrary (Exh. B-14 at 1527–33). Solvang's statements, taken as a whole, were not consistent this theory. Solvang's statement that petitioner was only an innocent witness would have put petitioner at the scene of the crime, destroying petitioner's defense that he had not been present when the crimes occurred. Admitting these statements would have been antithetical to counsel's trial strategy. Counsel's decision not to admit this evidence was part of a reasonably sound trial strategy. Accordingly, petitioner fails to show that his counsel's performance was deficient under *Strickland*.

Moreover, even if counsel had introduced Solvang's pretrial statements that petitioner was an innocent witness to a robbery and that Solvang was "possibly" the shooter, there is no reasonable probability that the jury would have found more favorably for petitioner. The record independently established that petitioner had a motive to kill his mother and stepfather. Independent evidence demonstrated that petitioner was upset with his parents when he visited with Powell and Perron on the afternoon before the homicides. The ballistics evidence showed that the rounds used in the murders were of the same type and caliber as the pistol petitioner had obtained from Frank Walker.

Other evidence placed petitioner at the scene of the murders.  Powell had heard shots, then heard Gloria Pillow scream, "No, Richard, no," and then Powell heard more shots.  Shortly after, Guillory saw petitioner outside the victims' house.  Evidence also established that after the shootings, petitioner demonstrated at least some consciousness of guilt.  He did not go to his mother's funeral.  He called Gary Beach from jail and asked him to lie that the gun he saw petitioner fire before the murders was not a .22-caliber weapon.  Petitioner also arranged for Coghlan to receive $1000 to transmit to Solvang, to prevent Guillory from testifying.

In sum, petitioner is incorrect that the jury would have had reasonable doubt respecting guilt even after considering all of Solvang's statements.  Petitioner therefore has not established prejudice under *Strickland.*  His claims of ineffective assistance of trial counsel lack merit.

### 4.  INEFFECTIVE ASSISTANCE OF COUNSEL BASED ON DEFENSE COUNSEL CONFLICT OF INTEREST.

During the guilt phase of petitioner's trial, petitioner was represented by Contra Costa Public Defender Charles James.[3]  Petitioner now argues that James represented petitioner while laboring under an impermissible and unconstitutional conflict of interest.  Specifically, petitioner alleges that the public defender's office represented Guillory and Solvang on different occasions.  Petitioner previously raised these conflict issues in his state court habeas petition (Exh. E-1, Arg. VI 112–36).  The Supreme Court of California summarily denied petitioner's claims without citing any authority or issuing a written opinion on the matter (Exh. E-27).  This order holds that the state court's dismissal of these claims was neither contrary to, nor an unreasonable application of, clearly-established federal law.

The right to effective assistance of counsel under the Sixth Amendment includes the right to conflict-free representation.  Where, as here, a defendant does not raise an objection based on an alleged conflict at trial, the individual "must demonstrate that an actual conflict of interest adversely affected his lawyer's performance."  *Cuyler v. Sullivan*, 446 U.S. 335, 348

---

[3] As noted above, petitioner dismissed James as his counsel during the penalty phase, choosing to represent himself with James' assistance only in an advisory role.

United States District Court

For the Northern District of California

1   (1980).  "To establish a Sixth Amendment violation based on a conflict of interest, a defendant

2   must show: (1) his attorney actively represented conflicting interests, and (2) an actual conflict

3   of interest affected his attorney's performance."  *Fitzpatrick v. McCormick*, 869 F.2d 1247,

4   1251 (9th Cir. 1989).  The Supreme Court has held, however, that "a defendant who shows that

5   a conflict of interest actually affected the adequacy of his representation need not demonstrate

6   prejudice in order to obtain relief.  But until a defendant shows that his counsel actively

7   represented conflicting interests, he has not established the constitutional predicate for his claim

8   of ineffective assistance."  *Cuyler*, 446 U.S. at 349–50.  Moreover, contrary to respondent's

9   contention, the *Cuyler* rule has not been restricted to allegations of concurrent representation.

10  The Ninth Circuit has held that "[i]t is clearly established by Supreme Court precedent that

11  'successive representation' may pose an actual conflict of interest because it may have an

12  adverse affect on counsel's performance."  *Alberni v. McDaniel*, 458 F.3d 860, 872 (9th Cir.

13  2006).

14          Even though multiple representation presents a possible conflict of interest, the

15  "possibility of conflict is insufficient to impugn a criminal conviction."  *Cuyler*, 446 U.S. at

16  350.  To demonstrate a violation of Sixth Amendment rights, "a defendant must establish that

17  an actual conflict of interest adversely affected his lawyer's performance."  *Ibid.*  Indeed, the

18  Supreme Court has "never held that the possibility of prejudice that 'inheres in almost every

19  instance of multiple representation' justifies the adoption of an inflexible rule that would

20  presume prejudice in all such cases."  *Burger v. Kemp*, 483 U.S. 776, 783 (1987) (quoting

21  *Cuyler*, 466 U.S. at 348).

22                      **A.      Imputed Disqualification.**

23          Significantly, although James was *the* Public Defender for Contra Costa County, there is

24  no evidence that he ever actively represented Guillory or Solvang.  The record reflects that

25  those duties fell to other deputy public defenders.  Petitioner points out several times throughout

26  his papers that James' name appeared as "counsel of record" for all defendants represented by

27  the public defender's office during James' tenure.  But the record does not show that James

28

                                                27

United States District Court
For the Northern District of California

accessed any confidential attorney-client communications between any deputies and Guillory or Solvang.  Petitioner implies that the deputies' knowledge could be imputed automatically to James.  The Ninth Circuit has rejected this theory, holding:

> The merits of [the petitioner's] imputed disqualification claim are not squarely governed by a holding of the Supreme Court.  The district court correctly notes that the Supreme Court has never applied the ethical imputed disqualification rule in Sixth Amendment analysis.  [*Lambert v. Blodgett*, 248 F. Supp. 2d 988, 1006 (E.D. Wash. 2003).]  To the contrary, even after assuming — without deciding — that "two law partners are considered as one attorney," the Supreme Court has nonetheless concluded that "'[r]equiring or permitting a single attorney to represent codefendants . . . is not per se violative of constitutional guarantees of effective assistance of counsel.'"  *Burger*, 483 U.S. at 783 (quoting *Holloway v. Arkansas*, 435 U.S. 475, 482 (1978)).  The Court in *Burger*, 483 U.S. at 784, rejected a rule that would presume a conflict of interest in such situations, in favor of a presumption "that the lawyer is fully conscious of the overarching duty of complete loyalty to his or her client."  Using the normal rules applicable to claims of ineffective assistance of counsel due to a conflict of interest, the Court in Burger held that counsel was not burdened by an actual conflict of interest where the attorney representing the petitioner's co-defendant prepared the appellate briefs for both the petitioner and his co-defendant, the attorney failed to argue certain mitigating evidence in the petitioner's brief although he had relied on such evidence at trial, and the two co-defendants asserted inherently inconsistent defenses.  *Id.* at 783-89.

*Lambert v. Blodgett*, 393 F.3d 943, 986 (9th Cir. 2004).  The *Lambert* court held that there was "no evidence suggesting that [the two attorneys] ever shared confidences regarding the management of [the co-defendants'] cases."  Accordingly, there were no grounds to grant habeas corpus relief.  *Id.* at 986–87.  Petitioner cites no decision since *Lambert* holding that a conflict could, under clearly-established federal law as determined by the Supreme Court, automatically impute a disabling conflict in this case.  Petitioner's claim fails for this reason.

### B.     Conflict as to Guillory.

Even assuming *arguendo* that an imputed conflict could constitute a Sixth Amendment violation, petitioner's argument still lacks merit.  Petitioner's assertion that James engaged in improper simultaneous representation of Guillory and petitioner is not supported by the record.

28

In fact, soon after James discovered that Guillory was a potential witness for the state, the public defender's office declared a conflict regarding the potential representation of Guillory.

Discovery was provided to James on August 15 and September 5, 1989, revealing that Guillory was a potential witness for the state (Exh. E-18 Nos. 95, 96). Petitioner's preliminary examination began on December 6, 1989, and James represented petitioner. The prosecutor called Guillory to testify. At some point during the testimony, the prosecution put on the record that it had learned about the payment of $1000 to silence Guillory. After that discovery, Inspector Sjostrand had taken Guillory to see deputy public defender Fox. Fox told Guillory that he had to conflict out of Guillory's case (Exh. E-18 No. 104, Exh. A-1 at 288–89).

On December 11, 1989, Guillory told Judge Garrett Grant, who was temporarily presiding over petitioner's preliminary examination, that there was a conflict of interest. The prosecutor then explained that there were at least two pending cases in which the public defender's office had previously been representing Guillory. The prosecutor said Guillory had requested that the prosecutor bring this situation to the court's attention. The prosecutor asked the judge to appoint an attorney from the conflicts panel so Guillory could consult with counsel about his pending cases and so the attorney could advise Guillory before taking any further testimony from Guillory in petitioner's preliminary examination (Exh. A-1 at 233). James, however, immediately told Judge Grant that the public defender's office had conflicted out of Guillory's case before the hearing (Exh. A-1 at 233–34).[4]

---

[4] James had the following colloquy with Judge Grant (Exh. A-1 at 233–34):

| Mr. James: | We conflicted on his case a number of weeks ago. However, I understand that [Guillory] has a bench warrant out from this court and another court. We haven't conflicted on cases where there was a bench warrant, but we did conflict on the one that was active some weeks [ago]." |
|---|---|
| The Court: | Do you know who represents him? |
| Mr. James: | Nobody. We conflicted. |
| The Court: | That's all done? |

29

A few weeks later, on December 21, 1989, Guillory's direct examination resumed at petitioner's preliminary examination.  Guillory was accompanied by Richard Alexander, who had been appointed by Judge Grant to represent Guillory.  Guillory was cross-examined by James.  Alexander was present to consult with Alexander during the cross-examination (Exh. A-1 at 276–95, 300).

"An actual conflict must be proved through a factual showing on the record."  *Morris v. State of Cal.*, 966 F.2d 448, 455 (9th Cir. 1992).  Petitioner's argument is premised on the allegation that the public defender's office represented Guillory and petitioner concurrently during petitioner's case.  Petitioner contends that James, as petitioner's counsel, was obligated to try to discredit Guillory.  But because the public defender's office also represented Guillory, that duty was allegedly compromised by a countervailing obligation to bolster Guillory's credibility so that Guillory could obtain the best plea agreements available on Guillory's other cases.[5]

| Mr. James: | Yes, we conflicted a number of weeks ago. |
| The Court: | Do you know if anybody was ever appointed? |
| [Prosecutor]: | Nobody as far as I know, nobody has been appointed to represent him on these cases. |
| Mr. James: | Unless there is some snafu, the computer shows conflict.  And I checked with clerical this morning, they indicated they filed a conflict. |

[5]  The key fact upon which petitioner relies comes from a declaration prepared by Guillory in October 1997.  In relevant part, the declaration states:

> I hit five parked cars and was arrested for felony driving under the influence.  I told my lawyer, a deputy public defender, that the DA was trying to make me be a witness on a murder case.  The lawyer said we could "get some action on that."  He thought we could work out a deal.  Later, the public defender declared a conflict and a different lawyer was appointed.  The drunk driving case just seemed to go away.  I was not told that I would have to testify to get a deal, but I did not have to go to prison or jail.  In my mind, I assumed it was because of my being a witness against Richard in the murder case.

(Exh. E-18 No. 102).

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    The record contradicts each of petitioner's contentions.  This order holds that while

2    petitioner's case was pending, neither James nor any other deputy public defender "actively

3    represented" anyone associated with petitioner's case other than petitioner.  During the

4    pendency of petitioner's case, petitioner was represented by the Contra Costa County public

5    defender's office.  James was the head of the office and listed as counsel in all cases handled by

6    the office.  The record reflects that Guillory was represented by the public defender's office in

7    several cases for, *at most*, a few weeks very early on in petitioner's case.  James stated at

8    petitioner's preliminary examination that the public defender's office declared a conflict as soon

9    as Guillory was identified as a possible witness in petitioner's case, weeks before the start of

10   petitioner's preliminary examination (Exh. A-1 at 233–34).  Most importantly, the record

11   refutes petitioner's contention that the public defender's office continued to represent Guillory

12   after his pending cases were brought to the attention of the judge at petitioner's preliminary

13   examination.  The public defender's office, through Fox, conflicted out of petitioner's

14   hit-and-run case.  Also, Alexander was appointed to take over Guillory's cases while

15   petitioner's case was pending (E-18 Nos. 99, 104).

16    Moreover, with respect to the representation of Guillory, petitioner has failed to carry

17   his burden of establishing an adverse effect on counsel's conduct as a result of the actual

18   conflict.  *See Maiden v. Bunnell*, 35 F.3d 477, 481–82 (9th Cir. 1994).  The only allegation of

19   an adverse effect is that James' cross-examination of Guillory at the preliminary examination

20   and trial was inadequate.  Petitioner contends that the alleged conflict prevented James "from

21

22    _____

23    The declaration is vague as to the date the public defender allegedly said Guillory could "get some
      action" for testifying in petitioner's case.  Indeed, it is vague as to the "murder case" the district attorney wanted

24   Guillory to testify about.  Moreover, the declaration does not establish that the district attorney promised
      Guillory any benefit for his testimony.  It only states that the drunk driving case "seemed to go away."  Guillory

25   "assumed" this was because of his testimony against petitioner.  Taking Guillory's declaration to be true, this
      order finds that any statement a deputy public defender made to Guillory about getting "action" in exchange for

26   his testimony occurred before Guillory was identified to the public defender's office as a possible witness in
      petitioner's case.  Thus, it occurred before Guillory's testimony at petitioner's preliminary examination and

27   trial.  In light of the more precise transcripts and other record evidence relied on by respondent, the value of the
      declaration relied on heavily by petitioner is marginal at best.

28

31

examining Guillory about expectations of leniency Guillory hoped to obtain from his testimony against petitioner" (Trav. 23).  Petitioner is incorrect.

At the preliminary examination, James cross-examined Guillory about his pending cases.  James also asked whether Guillory had received any favors or lenience in connection with his cases.  He also asked who, if anyone, was assisting in disposing of Guillory's pending cases and whether the disposition of Guillory's pending cases was related to Guillory's testimony in petitioner's case.  Guillory responded that the district attorney had made no promises in exchange for testimony and stated that his lawyer had not negotiated any deal in exchange for testifying in petitioner's case.  Guillory further testified that he and his lawyer were taking care of Guillory's warrants (Exh. A-1 at 294–301).

Likewise, at trial — long after the public defender's office had declared a conflict — James impeached Guillory by showing that Guillory used drugs; that he had been granted immunity in exchange for his testimony about his drug involvement; that he had used a false name to identify himself to police; that he had an outstanding warrant for his arrest when police first contacted him; that he had at least one drunk driving case pending while testifying at the preliminary examination; that he was not arrested on the warrant when he testified at the preliminary examination; and that about a week before trial, when Inspector Sjostrand handcuffed Guillory and took him to jail, Guillory told the inspector, "Man, you take me to jail and I'll make sure the motherfucker walks" (Exh. B-12 at 874–99).

In sum, no adverse effect on James' representation has been identified.  James questioned Guillory about any deal he was receiving in exchange for testimony.  Petitioner argues that James should have questioned Guillory about the alleged statement by a deputy public defender that they could "get some action" in exchange for his testimony.  As stated above, however, the record does not support petitioner's assumption that James even knew that such a statement might have been made to Guillory.  Nor, more importantly, does the record reflect that James himself represented Guillory while petitioner's proceedings were ongoing.  There is simply inadequate factual support for petitioner's allegations, which themselves only

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

describe a possible conflict falling short of being a constitutional violation.  There was no ineffective assistance of counsel based on the public defender's prior representation of Guillory.

### C.      Conflict as to Solvang.

Petitioner points to a similar conflict with Solvang.  Petitioner alleges that the public defender's office represented Solvang in at least three criminal cases prior to petitioner's trial.  Petitioner points out that Solvang — though he never testified in petitioner's trial — was a self-proclaimed suspect in the murders.[6]  Petitioner therefore contends  that James was presented with a true division of loyalties — he faced a scenario wherein he had to inculpate his former client, Solvang, in order to exculpate his (then) present client, petitioner.  James, however, never presented Solvang's incriminating remarks at the trial.  Petitioner argues that this decision was driven by his former representation of Solvang and evidenced James' conflict of interest as these statements were necessary to establish reasonable doubt concerning petitioner's guilt.

As with simultaneous representation, a conflict of interest can arise in cases of successive representation, "though it generally is more difficult to demonstrate an actual conflict resulting from successive representation."  *Fitzpatrick*, 869 F.2d at 1252.  In *Fitzpatrick*, the Ninth Circuit explained:

> This rule is necessary because the mere possession of a former client's and codefendant's privileged communications poses the precise potential for conflict.  In successive representation, conflicts of interest may arise if the cases are substantially related or if the attorney reveals privileged communications of the former client or otherwise divides his loyalties.  Among the dangers in a successive representation situation is that the attorney who has obtained privileged information from the former client may fail to conduct a rigorous cross-examination for fear of misusing that confidential information.  The potential for conflicting interests is particularly acute when . . . the two clients are, or were, codefendants who allege different levels of culpability in the crime.

---

[6] As described above, Solvang at one point told defense Investigator Rock that he was "possibly" the true killer, as opposed to petitioner.

33

*Ibid.* (citations, quotations, and alterations omitted).

"Under Supreme Court precedent, [petitioner] needs only to meet the lower standard of showing that the attorney's behavior seems to have been influenced by the conflict." *Lockhart v. Terhune*, 250 F.3d 1223, 1231 (9th Cir. 2001) (quotations omitted). If this Court can "discern no tactical justification for [the attorney's] decisions," it may "conclude that he was likely motivated by a desire to protect his other client." *Id.* at 1232.

As discussed above, there is no evidence that James had any personal involvement in any of Solvang's previous cases. Petitioner also fails to allege that at the time of petitioner's trial in 1991, James was aware of confidential information regarding Solvang's prior cases that would have given rise to an actual conflict of interest. Nothing in the record demonstrates that James accessed any confidential case files. It does not appear that there was an actual conflict of interest. *See Cuyler*, 446 U.S. at 348 ("[A] reviewing court cannot presume that the possibility for conflict has resulted in ineffective assistance of counsel.").

Furthermore, as respondent notes in its answer, there was no adverse effect on petitioner's representation due to the office's previous representation of Solvang. *See Maiden*, 35 F.3d at 482 ("[The petitioner] has not met his burden of pointing to some aspect of [counsel's] trial performance which was a likely adverse effect stemming from the alleged conflict of interest."). For example, James clearly tried to produce Solvang as a witness for petitioner at trial. It was Solvang's decision to invoke his right against self-incrimination. There is no evidence that James suggested that he invoke it.

Moreover, as discussed above, James' alleged conflict of interest was not, as petitioner alleges, demonstrated by his failure to introduce evidence of Solvang's testimony at the trial. There were sound tactical justifications for James' decision. James could have determined that Solvang's possible self-inculpatory statement that he was "possibly" involved in the murders, could have opened the door to earlier, contradictory statements by Solvang. *See* Cal. Evid. Code 1235 (permitting admission of prior inconsistent statements). Solvang's previous statements, as described above, were extremely inculpatory of petitioner. Solvang had, in other

34

interviews, described petitioner's motive for the killings, how petitioner had acquired the gun used to commit the crimes, and how, after the murders, petitioner had admitted to Solvang that he killed each victim and the family dog.  Furthermore, Solvang's "admission" that he was "possibly" the shooter would have placed petitioner at the scene of the murders and would have undermined petitioner's defense that he was not present.

Petitioner has not established that James was operating under a conflict of interest because of the office's prior representation of Solvang.  The reasonable trial decisions James made do not reflect an adverse effect on counsel's conduct.  Petitioner repeatedly contends that Solvang's hearsay statements were admissible and potentially exculpatory.  Viewing those statements in light of other hearsay statements by Solvang and James' trial strategy, however, it was probably best to refrain from referring to any of those statements.  The record does not support to the contention that counsel was motivated by a desire to protect the office's former client.  Petitioner has not established any entitlement to habeas relief on account of any conflict of interest in representation.

## CONCLUSION

For the reasons stated, the petition for writ of habeas corpus is **DENIED**.

**IT IS SO ORDERED.**

Dated:  May 31, 2007.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE